**CROMAN CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 98–405 C.**

United States Court of Federal Claims.

July 12, 2001.

nity to demonstrate whether the Government's conduct was arbitrary and capricious.

Alan I. Saltman, Washington, DC, for plaintiff. Richard W. Goeken, Washington, DC, of counsel.

John S. Groat, with whom were Kathryn A. Bleecker, Assistant Director, David M. Cohen, Director, and Stuart E. Schiffer, Acting Assistant Attorney General, Civil Division, Department of Justice, Washington, DC, for defendant. Leslie Lagomarcino and Jamie Rosen, Department of Agriculture, and Susan Cook, Environmental and Natural Resources Division, Department of Justice, Washington, DC, of counsel.

## OPINION AND ORDER

HEWITT, Judge.

This is a suit for damages alleged to have resulted from the suspension of a timber sale contract. The performance of the contract was delayed following the listing by the Fish and Wildlife Service of the United States Department of the Interior (Fish and Wildlife) of the marbled murrelet as a threatened species and the resulting investigation of a portion of the Klamath National Forest in California to determine whether that area was a murrelet habitat. Plaintiff, Croman Corporation (Croman), argues that it temporarily lost the benefit of its contract for the logging of the land in question and sustained damages as a result. Defendant, the United States, acting through the Forest Service of the Department of Agriculture (Forest Service), argues that plaintiff voluntarily suspended its own contract and that, even if the government were responsible for the suspension of the contract, plaintiff is not entitled to damages. The matter is before the court on the parties' cross-motions for summary judg-

ment on Counts II and III of the Amended Complaint. Count II alleges that defendant breached its duty not to hinder the performance of plaintiff's contract by unreasonably suspending logging operations, and Count III alleges that the contract constituted property that was taken by defendant in violation of the Fifth Amendment to the United States Constitution.

This is the second set of dispositive motions that the court has considered in this case. Plaintiff moved for summary judgment on liability on December 22, 1998, and defendant cross-moved for summary judgment and moved to dismiss on May 11, 1999. Defendant argued in its motion to dismiss that plaintiff's claim of a July 1992 suspension of contract operations had not been submitted to the contracting officer and was therefore outside the court's jurisdiction. Defendant's Motion to Dismiss, Opposition to Plaintiff's Motion for Summary Judgment, and Cross Motion for Summary Judgment (Def.MTD) at 9–14. In an opinion filed on October 1, 1999, the court agreed and dismissed plaintiff's July 1992 suspension claim.[1] *Croman Corp. v. United States*, 44 Fed.Cl. 796, 808 (1999). The court then examined whether a suspension of contract operations from October 9, 1992 to August 28, 1995 was unauthorized or unreasonable. *Id.* at 804–07. The court determined that the listing of the marbled murrelet on September 28, 1992 constituted a sovereign act and that the application of the sovereign acts doctrine authorized the suspension of operations in October 1992. *Id.* at 807. For that reason, the court granted summary judgment to defendant on Count I of plaintiff's Amended Complaint (Am. Compl.), which alleged an unauthorized suspension of the contract. *Id.* The court declined to rule on the question of whether the steps taken by defendant after the initial suspension were unreasonable and constitut-

---

1. Plaintiff first contended that its operations were suspended in September or October of 1992 as a result of the listing of the marbled murrelet as a threatened species. *Croman*, 44 Fed.Cl. at 799. In connection with its prior motion for summary judgment, plaintiff submitted Supplemental Proposed Findings of Uncontroverted Fact alleging that its operations were

suspended in July 1992. *Id.* On January 22, 2001, plaintiff filed a separate suit in this court, docketed as case number 01–40 C, contending that the Forest Service suspended operations on plaintiff's contract in July 1992. By order dated March 1, 2001, the court stayed all proceedings in that case pending the final resolution of this matter.

ed a breach of an implied duty not to unduly hinder plaintiff's performance. *Id.*

On October 18, 1999, plaintiff sought reconsideration of the court's October 1, 1999 opinion insofar as the court found the sovereign acts doctrine applicable. Plaintiff's Motion for Reconsideration (Pl.Mot.Reconsid.) at 1. The court denied the motion for reconsideration on October 28, 1999. By order of February 13, 2001, after briefing on the current set of dispositive motions, the court reopened consideration of its October 1, 1999 opinion and invited further briefing of the sovereign acts issue. After review of the parties' further briefing, the court WITHDRAWS the portion of subsection II.B.1 of its October 1, 1999 opinion holding that the sovereign acts doctrine authorized the suspension of operations on plaintiff's contract because of the listing of the marbled murrelet as a threatened species. *See Croman,* 44 Fed.Cl. at 804–07. For the reasons discussed in section I.B below, however, the court's conclusion in its October 1, 1999 opinion that defendant is entitled to summary judgment on Count I of the Amended Complaint is undisturbed.

With respect to the current motions and for the following reasons, plaintiff's motion for summary judgment with respect to Count II is GRANTED in part and DENIED in part, and plaintiff's motion for summary judgment with respect to Count III is DENIED. Defendant's motion for summary judgment is GRANTED in part and DENIED in part with respect to Count II. Defendant's motion for summary judgment with respect to Count III is GRANTED.

## I. Background

### A. The Dispute

The contract is for the sale and harvest of timber located on the Happy Camp Ranger District of the Klamath National Forest (Klamath) in California. Plaintiff's Corrected Proposed Findings of Uncontroverted Fact in Support of its Motions for Summary Judgment as to Counts II and III of the Amended Complaint,[2] filed on February 9, 2001 (Pl. Second PFUF) ¶ 11.[3] When the dispute arose, the contract was one of the oldest timber contracts still not fully performed. Pl.App. at 243. Standard Veneer and Timber Company was awarded the contract in 1970 and transferred all rights and obligations under the contract to Standard Plywood Corporation in 1973. Plaintiff's Proposed Findings of Uncontroverted Fact (Pl. First PFUF) ¶¶ 1, 6. Plaintiff purchased the contract in 1979. *Id.* ¶ 28.

The original contract was to terminate on March 31, 1974. Pl. Second PFUF ¶ 13. Prior to plaintiff's purchase of the contract, the contract termination date was extended many times by agreement of the parties. *Id.* ¶¶ 14–15, 17–21, 24. The contract contained a standard provision, Paragraph C8.22, allowing for adjustments to the contract termination date in certain circumstances. Appendix to Defendant's Corrected Motion to Dismiss, Opposition to Plaintiff's Motion for Summary Judgment, and Cross Motion for Summary Judgment (Def.App.) at 77. The relevant portion of ¶ C8.22 provided as follows:

> "Contract Term Adjustment" means an extension under a written permit to delay ... for any of the three circumstances described in this Subsection. Under said circumstances, the contract term shall be adjusted in writing to include additional calendar days in one or more Normal Operating Seasons equal to the actual time lost ....
>
> ... The three circumstances qualifying for a Contract Term Adjustment are:
>
> (a) Purchaser experiences delay in starting scheduled operations or interruption in active operations either of which

---

**2.** Plaintiff's original complaint alleged that defendant had suspended operations on the contract unreasonably and without authorization and thereby breached the contract. Complaint ¶¶ 38, 71–73. Plaintiff filed an Amended Complaint on September 15, 1998 (Am.Compl.), pleading in the alternative that its contractual rights were taken without just compensation.

Am. Compl. ¶¶ 75–77. The taking claim was added as Count III. *Id.* The original complaint was not otherwise changed.

**3.** None of the statements cited to one party's Proposed Findings of Uncontroverted Facts has been controverted by the other party.

stops removal of Included Timber from Sale Area through curtailment in felling and bucking, yarding, skidding and loading, hauling or road construction, as scheduled in B6.31, of 10 or more consecutive calendar days during a Normal Operating Season due to causes beyond Purchaser's control, including but not limited to acts of God, acts of the public enemy, acts of Government, labor disputes, fires, insurrections or floods.[4]

*Id.* at 76–77. After plaintiff's purchase of the contract, several Contract Term Adjustments were granted, extending the contract termination date. Pl. Second PFUF ¶¶ 28–32.

On June 20, 1991, after the termination date of the contract had been extended to December 31, 1993, Fish and Wildlife published a proposed rule to list the marbled murrelet[5] as a threatened species under the Endangered Species Act (ESA), 16 U.S.C. § 1531. Am. Compl. ¶ 20. The regional forester for the Pacific Southwest Region issued a management direction on May 8, 1992, directing the forest supervisors for various forests, including the Klamath National Forest, to conduct surveys to detect the presence of marbled murrelets. Plaintiff's Supplemental Appendix (Pl.Supp.App.) at 512, 518. The management direction noted the proposed listing of the marbled murrelet, and stated that forests should conduct surveys for timber sales within 35 miles of the Pacific coast in which there was standing timber volume on June 20, 1992. *Id.* at 512. The Clearview sale was located within 35 miles of the coast. Def.App. at 385.

The forest supervisors for the Klamath National Forest responded to the regional forester on May 21, 1992, outlining their plans to survey several timber sales. Pl. Supp.App. at 518–21. The forest supervisors stated that there was an "almost harvested"

sale within 35 miles of the coast that would not be surveyed.[6] *Id.* at 518. No surveys were done on the Clearview site in 1992. Pl. Second PFUF ¶ 42. Unconfirmed sightings of marbled murrelets were reported on the site of a proposed timber sale approximately 35 miles from the coast, not then under contract, in the Happy Camp Ranger District in the Klamath National Forest. Defendant's Renewed Proposed Findings of Uncontroverted Fact (DPFUF) ¶ 8; Pl. Second PFUF ¶ 41.

Effective September 28, 1992, Fish and Wildlife listed the marbled murrelet of Washington, Oregon, and California as a threatened species under the ESA. 57 Fed.Reg. 45,328, 45,330 (1992). The regional forester issued a statement on September 29, 1992, stating that no felling was permitted on any timber sale contract in marbled murrelet habitat until after consultation with the Fish and Wildlife Service. Pl. Supp.App. at 603. The statement also noted that any project that "may affect" the marbled murrelet "should be suspended and no irreversible or irretrievable commitment of resources made until consultation with the Fish and Wildlife Service is completed." *Id.*

The Forest Service submitted a biological assessment of sales within 35 miles of the coast, including the Clearview sale, to Fish and Wildlife on October 7, 1992 and requested formal consultation. Defendant's Supplemental Appendix (Def.Supp.App.) at 922. The biological assessment concluded that the Clearview sale "May Affect, and [is] Likely to Adversely Affect the marbled murrelet." *Id.* at 926. Between October 1992 and July 1993, there were numerous inconclusive communications and discussions between the Forest Service and Fish and Wildlife regarding the procedures for conducting surveys on

4. Paragraph C8.22 also provided for Contract Term Adjustments in the event that causes beyond plaintiff's control "substantially affect the disposition or processing of Included Timber during Normal Operating Season through their effects on primary timber processing facilities," or in the event that plaintiff consents to a Forest Service delay request or is forced to suspend operations because of a "fire emergency closure." Def.App. at 77. None of those provisions is applicable here.

5. The marbled murrelet is a small bird that lives in both marine and inland forested environments along the North American Pacific coast. Am. Compl. ¶ 12. The marbled murrelet travels inland to nest, typically between April and September. Am. Compl. ¶ 12.

6. The reference to an "almost harvested" sale may refer to plaintiff's timber contract, although the Clearview sale was not explicitly identified.

the Clearview site and on other sites. *See id.* at 943–50. Surveys were conducted from July 15, 1993 through August 13, 1993, but those surveys were insufficient to satisfy the applicable protocol. Plaintiff's Reply in Support of its Motion for Summary Judgment as to Count III, Response in Opposition to Defendant's "Renewed" Motion for Summary Judgment as to Count II and Cross Motion for Summary Judgment as to Count II (Pl. Opp.) Exh. 1 at 16(a); Pl. First PFUF ¶ 54. Plaintiff and defendant agreed, on May 26, 1994, that plaintiff would conduct the surveys and would be reimbursed for its costs. Def. Supp.App. at 951–53. The surveys were completed on August 24, 1995. *Id.* at 961. On August 28, 1995, the Forest Service informed plaintiff that it was free to resume operations on the Clearview site, no marbled murrelets having been detected. *Id.* at 962. Plaintiff completed the harvesting of the sale in June of 1996. Def.App. at 569.

On May 1, 1997, plaintiff filed a claim with the contracting officer seeking damages of $4,854,884.95 allegedly sustained "as a result of the Forest Service's wrongful suspension of [plaintiff's] operations from September 28, 1992 through August 28, 1995." Def.App. at 554. On September 11, 1997, the contracting officer issued a final decision denying plaintiff's claim and finding that the "Forest Service acted properly and in accordance with federal law when the operations under the Clearview contract were delayed as a result of the listing of the marbled murrelet." *Id.* at 572. The contracting officer further held that the Forest Service did not breach the Clearview contract, since the listing of the marbled murrelet was a sovereign act. *Id.* Plaintiff brought suit in this court on April 24, 1998.

## B. Prior Proceedings and Grant of Motion for Reconsideration

■ In an initial round of motions, plaintiff moved for summary judgment that the suspension of the contract following the listing of the marbled murrelet was unauthorized and in breach of its contract. Plaintiff's Memorandum in Support of its Motion for Summary Judgment on the Issue of Liability as to Count I at 1–2. Defendant cross-moved for summary judgment that any suspension was consistent with the contract and that defendant had not suspended operations, and moved to dismiss claims not presented to the contracting officer. Def. MTD at 9–10, 16–21. The court held in its first opinion in this matter that the implementation by the Forest Service of the listing of the marbled murrelet as a threatened species under the Endangered Species Act was a sovereign act for which defendant cannot be held liable for breach of contract. *Croman,* 44 Fed.Cl. at 807.

Plaintiff raised an objection to that holding in its Motion for Reconsideration, filed on October 18, 1999, and its briefing on the present cross-motions for summary judgment. Pl. Mot. Reconsid. at 1; Pl. Opp. at 1–2. Specifically, plaintiff argues that the sovereign acts doctrine cannot excuse a suspension of the contract because the parties foresaw the possibility of those events and allocated the risks in the contract. Pl. Mot. Reconsid. at 2–3; Pl. Opp. at 1–2. Plaintiff cites *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (plurality opinion of Souter, J.), *see* Pl. Mot. Reconsid. at 2, in which a plurality of the Supreme Court held that the government must show that the impossibility defense is applicable to invoke the sovereign acts doctrine. 518 U.S. at 904–06, 116 S.Ct. 2432. In *Winstar,* the governmental act in question was the passage of a law abrogating the government's agreements with various thrifts. *Id.* at 855, 870, 116 S.Ct. 2432. The Supreme Court found that the contract, by providing for particular regulatory treatment, had "allocate[d] the risk of regulatory change." *Id.* at 906, 116 S.Ct. 2432. The Supreme Court inferred the allocation of the risk of a sovereign act despite the absence of contract language addressing that possibility. *Id.* at 905–06, 116 S.Ct. 2432. In this case the terms of contract—in ¶ C8.22—in fact directly addressed the risk of a sovereign act ("acts of Government," *see* Def.App. at 77) and specifically provided for a time adjustment in that event. Def.App. at 77. The court finds plaintiff's argument persuasive.

In a timber sale case involving a more recently drafted contract, this court found

that the listing of the marbled murrelet as a threatened species cannot be considered a sovereign act when the timber sale contract at issue specifically allocated the rights and responsibilities of the parties in the event of the suspension of contract operations due to environmental protection concerns. *Scott Timber Co. v. United States*, 40 Fed.Cl. 492, 508 (1998), *vacated on other grounds*, 44 Fed.Cl. 170 (1999). The *Scott Timber* contract was more specific than plaintiff's in its allocation of risks in connection with suspension of work for the protection of endangered species. *See* 40 Fed.Cl. at 508 ("[C]lauses C6.01 and C6.25 of the contracts between plaintiff and the Forest Service show that the parties specifically foresaw the possibility that ... performance of the contracts might threaten the existence of protected species ... [and] specifically set[ ] forth the rights and responsibilities of the parties, if any, if those contingencies should arise"). The court finds here that the general provision in ¶ C8.22 for a Contract Term Adjustment in plaintiff's contract was sufficient to indicate that the nonoccurrence of sovereign government action was not a "basic assumption" of the contract. *See Winstar* at 904, 116 S.Ct. 2432 (plurality opinion of Souter, J.).

Defendant argues that *Winstar* does not bind this court, since the main opinion was a plurality rather than a majority. Def. Opp. Reconsid. at 11. The court notes, however, that Justice Souter's plurality opinion has been quoted and relied on extensively in decisions of this court and of the Federal Circuit addressing the sovereign acts doctrine. *See, e.g., Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1574–75 (Fed. Cir.1997), *cert. denied*, 524 U.S. 951, 118 S.Ct. 2365, 141 L.Ed.2d 735 (1998); *Castle v. United States*, 48 Fed.Cl. 187, 217 n. 23 (2000); *General Dynamics Corp. v. United States*, 47 Fed.Cl. 514, 534 (2000).

Because the risk of "acts of Government" was addressed and allocated by the contract, the court finds that its application of the sovereign acts doctrine to this case in its opinion and order of October 1, 1999 was incorrect. The court therefore GRANTS plaintiff's Motion for Reconsideration. The court withdraws its holding in subsection II.

B.1 of its October 1, 1999 opinion that "[t]he implementation by the Forest Service of ESA requirements with respect to the marbled murrelet" constituted a sovereign act. *Croman*, 44 Fed.Cl. at 807. The enactment of the ESA and the listing of the marbled murrelet as a threatened species were acts of Government binding on both the Forest Service and plaintiff. The risks of those acts of Government were contemplated by and allocated by ¶ C8.22 of the contract.

The court notes, however, that it granted summary judgment to defendant in its earlier opinion on Count I of the Amended Complaint, which alleged an unauthorized suspension of operations on the contract. *Croman*, 44 Fed.Cl. at 807. The court found that the ESA required the Forest Service to suspend operations upon the listing of the marbled murrelet as a threatened species. *Id.* at 806–07. The court's withdrawal of its holding regarding the applicability of the sovereign acts doctrine does not change the court's conclusion regarding the authorization for the suspension of the contract after the September 28, 1992 listing of the marbled murrelet as a threatened species. Accordingly, the court's conclusion in its October 1, 1999 opinion that defendant is entitled to summary judgment on Count I of the Amended Complaint is not affected by the court's revision of its view of the applicability of the sovereign acts doctrine.

## II. Discussion of Current Motions

### A. Summary Judgment

Summary judgment is appropriate when "there is no genuine issue of material fact and ... the moving party is entitled to judgment as a matter of law." Rule of the Court of Federal Claims (RCFC) 56(c); *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1131 (Fed.Cir.1998). A fact that may affect the outcome of the suit is material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must construe all facts in the light most favorable to the nonmovant. *Id.* at 255, 106 S.Ct. 2505. The movant bears the initial burden of showing that there is no genuine issue of material fact; if the movant satisfies that standard, the burden shifts to

the nonmovant to show, for each issue on which it will bear the burden of proof at trial, that there is a "genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the case is before the court on cross-motions for summary judgment, each motion is evaluated under the same standard. *Cubic Defense Sys., Inc. v. United States*, 45 Fed.Cl. 450, 457 (1999). Contract interpretation is a question of law appropriately resolved on summary judgment. *Gov't Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 812 n. 1 (Fed.Cir.1988).

### B. Defendant's Initial Suspension of Contract Operations Was Not a Breach of Contract

Plaintiff contends that defendant breached the contract by suspending contract work. Pl. Opp. at 9–11. While defendant continues to assert that plaintiff suspended its own operations in July 1992, *see* Defendant's Response to Plaintiff's November 13, 2000 Cross Motion for Summary Judgment as to Count II and Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Def.Reply) at 3–4, defendant now acknowledges, that "had Croman been operating in September and October 1992 . . . the Forest Service would have been required to suspend its operations." Defendant's Response to the Court's February 13, 2001 Order and Plaintiff's Motion for Reconsideration (Def.Opp.Reconsid.) at 14.

The record, consistent with defendant's acknowledgment, shows that plaintiff was not free to resume work after the listing. An internal message among Forest Service employees dated July 17, 1993 discussed the Clearview sale, along with another sale, and referred to "continuing the suspension on these sales until survey and consultation are completed." Def. Supp.App. at 950(j). Plaintiff wrote to the Happy Camp Ranger District on December 1, 1993, stating that plaintiff had been notified in early 1993 that the timber sale would be suspended and requesting a one-year Contract Term Adjustment on the contract. Def.App. at 490. The

parties entered into an agreement in May of 1994 that stated that plaintiff "has been delayed from harvesting timber until such time as the impacts of the sale to marbled murrelet populations and habitat can be accessed," and provided that plaintiff would conduct the surveys and would be reimbursed upon the completion of the surveys. Def. Supp.App. at 952. Defendant's August 28, 1995 letter to plaintiff stated that plaintiff was "now authorized to proceed with harvest operations on the sale." Plaintiff's Appendix (Pl.App.) at 240.

Plaintiff, as the movant for summary judgment on this issue, has furnished or pointed to evidence sufficient to show that it was not free to carry out contract operations after the listing of the marbled murrelet as a threatened species.[7] *See, e.g.,* Def. Supp. App. at 950(m), 952; Pl.App. at 240. Upon that showing, the burden shifts to defendant to point to specific facts that preclude the entry of summary judgment in plaintiff's favor. *See* Rule 56(f) of the United States Court of Federal Claims ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of such party's pleading, but such party's response . . . must set forth specific facts showing that there is a genuine issue for trial."). Defendant has not made a factual showing to rebut the evidence that plaintiff's contract was effectively suspended after the listing.

The court found in its earlier opinion that the enactment of the ESA and the listing of the marbled murrelet as a threatened species were acts taken in the government's sovereign capacity. *Croman*, 44 Fed.Cl. at 807. The court then concluded that the sovereign acts doctrine excused the suspension. *Id.* The court's reconsideration of that decision is based not on a finding that the government was not acting as a sovereign when Fish and Wildlife listed the marbled murrelet as a threatened species, but rather on its determination that the contract allocated the risk of delay caused by "acts of Government." Def. App. at 77. The ESA requires that an agen-

---

7. The court notes that it is not relevant for purposes of this question whether plaintiff's operations were ongoing at the time when operations were suspended.

cy "insure that any action" it "authorize[s], fund[s], or carrie[s] out ... is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2) (2000). To that end, the ESA requires that the agency consult with the Department of the Interior and refrain from any "irreversible or irretrievable commitment of resources ... which has the effect of foreclosing the formulation or implementation" of any approach that might avoid harm to the species in question. *Id.* § 1536(a)(2), (d). Since the initial suspension of sale operations was required by the ESA and by the listing of the murrelet as a threatened species, the court finds that the suspension following the listing was an "act of Government" contemplated by the contract.[8] The initial suspension was therefore not in breach of the parties' contract.

### C. Whether an Unreasonable Delay Followed the Initial Suspension

The court must now determine whether defendant's conduct in implementing the listing was a breach of contract. Plaintiff alleges that defendant's conduct magnified the effect of the suspension of contract operations and thereby caused damages that were not caused by the listing itself. Pl. Opp. at 11–13.

#### 1. Legal Basis for Remedy for Unreasonable Delay

In an analogous context, the Supreme Court has held that, when a contract clause reserved the government's right to make specific changes and gave the contractor a right to an extension of time should the government exercise that right, the contractor is not entitled to delay damages unless specifically provided for elsewhere in the contract. *United States v. Rice*, 317 U.S. 61,

65–66, 63 S.Ct. 120, 87 L.Ed. 53 (1942). The clause at issue in *Rice* directed that "any increase or decrease of cost and (or) difference in time resulting from such changes shall be adjusted," and the court found that the provision for cost adjustment referred to structural changes necessitated by the changed plans, rather than damages. *Id.* at 67 & n. 1, 63 S.Ct. 120. The *Rice* doctrine is now rarely applied, since most government contracts expressly provide for equitable adjustments when conditions change. *See Merritt–Chapman & Scott Corp. v. United States*, 192 Ct.Cl. 848, 429 F.2d 431, 444–45 (1970) (distinguishing *Rice* on the ground that the "Changed Conditions" clauses in *Merritt–Chapman* expressly provided for an equitable adjustment and stating that "the so-called 'Rice' problem has now been eliminated, by revisions of the 'Changes' and 'Changed Conditions' clauses").

The *Rice* doctrine applies with even greater force where, as here, the supervening events ("acts of Government") are beyond the control of the contracting agency. Many government contracts now include a "Suspension of Work" clause requiring that the government grant the contractor a price adjustment when it unilaterally suspends operations. *See, e.g., Merritt–Chapman*, 429 F.2d at 445. The contract at issue here, however, did not contain a "Suspension of Work" clause, and the "Changed Conditions" clause referred only to a "substantial change in the physical conditions of Sale Area or Included Timber since the date of this contract." Def.App. at 59. The court therefore believes that the Forest Service here is entitled to the benefit of the rights and remedies provided by its contract to at least the same extent as the government contracting entity in *Rice*.

---

**8.** The court notes that the Ninth Circuit Court of Appeals recently held, in *Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, (9th Cir. 2001), that once one round of consultation regarding a threat to one species has been completed, Fish and Wildlife had no duty to reinitiate consultation affecting the exercise of an "incidental take permit" upon the listing of different species as threatened. *Id.* at 1074, 1079 – 85. The Ninth Circuit's decision turned on its finding that the. federal agency had not retained suffi-

cient discretionary involvement or control over the permit to trigger reinitiation of consultation. *Id.* at 1080 – 81; *see* 50 C.F.R. § 402.16 ("Reinitiation of formal consultation is required and shall be requested by the Federal agency or by [Fish and Wildlife], where discretionary Federal involvement or control over the action has been retained or is authorized by law."). This case does not involve the exercise of control through a permit or the reinitiation of consultation.

The *Rice* doctrine is not absolute, however. The Supreme Court has stated that the effectiveness of a contract remedy to exclude other remedies is subject to a reasonableness requirement. *See United States v. Utah Constr. and Mining Co.*, 384 U.S. 394, 402, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966) ("[W]hen only partial relief is available under the contract ... the contractor may secure damages in breach of contract if the Government's conduct has been unreasonable."). The Court of Claims has also noted that the character of the government's conduct is a consideration in determining whether *Rice* applies. *Laburnum Constr. Corp. v. United States*, 163 Ct.Cl. 339, 325 F.2d 451, 458 (1963) ("This exculpatory rule is not applicable to a situation in which unreasonable delays were the ... fault of the Government."). *See also Koppers/Clough v. United States*, 201 Ct.Cl. 344, 363, 1973 WL 21338 (1973) (stating that contractor may recover damages despite contract's provision for equitable adjustment as exclusive remedy, but that "the predicate for recovery has always been that the Government has been at fault or is responsible" and that "[m]ere proof of delay or of loss has not been enough"); *Gardner Displays Co. v. United States*, 171 Ct.Cl. 497, 346 F.2d 585, 588–89 (1965) (stating that *Rice* "does not apply to preclude monetary damages for that part of a delay found to be unreasonable"); *Kehm Corp. v. United States*, 119 Ct.Cl. 454, 93 F.Supp. 620, 624 (1950) (holding that the government had been "far from diligent," and distinguishing Supreme Court case in which the government had exhibited " 'great, if not unusual, diligence' ") (quoting *United States v. Howard P. Foley Co.*, 329 U.S. 64, 67, 107 Ct.Cl. 710, 67 S.Ct. 154, 91 L.Ed. 44 (1946)).

■ Courts have also commonly read into contracts an implied duty to cooperate and not to hinder, which is violated when a party "unreasonably cause[s] delay or hindrance to contract performance." *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1542 (Fed.Cir.1993); *see also Malone v. United States*, 849 F.2d 1441, 1445 (Fed.Cir.1988); *Lewis–Nicholson, Inc. v. United States*, 213 Ct.Cl. 192, 550 F.2d 26, 32 (1977). When the original cause of a delay is not under a party's control, therefore, but the party's conduct exacerbates the delay, that party may be found to have breached the implied duty of cooperation. *Lewis–Nicholson*, 550 F.2d at 31–32 (finding breach of implied duty when government discovered instability in hillside but unreasonably delayed design changes).

■ Plaintiff cites *Yankee Atomic Elec. Co. v. United States*, 42 Fed.Cl. 223, 232–33 (1998), *aff'd*, 225 F.3d 1336 (Fed.Cir.2000), for the proposition that a contractual remedy is exclusive only if the parties clearly so agreed. Plaintiff's Corrected Reply in Support of its Motion for Summary Judgment on Count II (Pl.Reply) at 12–13. The court noted in that case, however, that "[a] contractor is required to prove that the government's conduct has been 'unreasonable' when it alleges a breach of either the implied duty not to hinder or unreasonably delay performance or the implied duty of good faith and fair dealing." 42 Fed.Cl. at 232 n. 4. Even if the remedy of contract extension contained in ¶ C8.22 is not exclusive, the breach plaintiff alleges here is a breach of an implied duty. Plaintiff must show that the government's conduct subsequent to the suspension was unreasonable or wrongful.

Plaintiff also cites *Cedar Lumber, Inc. v. United States*, 5 Cl.Ct. 539 (1984), for the proposition that clauses providing for time adjustments in the event of disruptions by forces outside the parties control do not thereby exclude other remedies. Pl. Reply at 13. This court recognized in *Cedar Lumber*, however, that "[i]n the absence of a specific warranty, fault is a necessary ingredient to an action for breach of the duty of cooperation." 5 Cl.Ct. at 550. This court also noted that contract language providing solely for a time adjustment in the event of a delay, and shielding the government from all other contract liability when the delay is caused by a breach of contract, must be "clear and express." *Id.* at 552. The exception to the *Rice* doctrine recognized in *Cedar Lumber* turns on whether the government's conduct breaches the contract. *See id.* ("The pertinent clause provides for an extension of time for events 'beyond the Purchaser's control' so that an extension of time

would be appropriate for an 'act of the government,' an event beyond plaintiff's control. This language does not, however, preclude damages for an act of the government which constitutes a breach of contract. When the government intends to disclaim liability for breach of contract, it must employ clear and express language to effectuate its intent."). Accordingly, to obtain relief other than the relief of an extension of contract term specified in ¶ C8.22, plaintiff here must show that defendant's conduct violated the implied duty of cooperation or was otherwise unreasonable or wrongful.

> 2. Genuine Issues of Material Fact Exist Concerning Reasonableness of Delay

■ Plaintiff argues that defendant was required to minimize the impact of the suspension on plaintiff, see Pl. Opp. at 11–13, and that "most of the three-year delay was caused by Forest Service actions which were not consistent with [defendant's] fulfilling its obligations under the ESA." Id. at 13. Defendant contends that it "acted in a reasonable and responsible manner" in its implementation of the listing. Def. Opp. Reconsid. at 14.

The survey protocol governing the detection of marbled murrelets, prepared by the Pacific Seabird Group and adopted by Fish and Wildlife, see Pl.App. at 231, 236, established a method for conducting marbled murrelet surveys. Id. at 230–35. The protocol required two consecutive years of surveys before an area could be determined to be a marbled murrelet habitat. Id. at 234. The protocol also stated that the season during which surveys must be conducted for California sites extends from April 15 to August 5. Id. at 231.

The record also shows that the Forest Service wrote to Fish and Wildlife on October 6, 1992, stating that the Forest Service would "[p]rovide a biological opinion through formal consultation on the sales under contract within 35 miles of the coast on the Klamath National Forest." [9] Def. Supp.App. at 920. The Forest Service submitted a biological assessment to Fish and Wildlife on October 7, 1992 and requested formal consultation.[10] Id. at 922. The biological assessment concluded that the Clearview sale "May Affect, and [is] Likely to Adversely Affect the marbled murrelet." Id. at 926. On November 16, 1992, the Forest Service wrote to Fish and Wildlife again, requesting consultation on the effects of thirteen additional timber sales on the marbled murrelet. Id. at 937. The Forest Service requested that Clearview and three other sales be given a higher priority in Fish and Wildlife's review. Id. at 938. Fish and Wildlife responded to the Forest Service on February 22, 1993, recommending a ground inspection "to determine [the] suitability for marbled murrelet nesting" on the Clearview site before formal consultation, and offering the services of a Fish and Wildlife representative to assist with the ground inspection. Id. at 943. A visit was scheduled for March 25 and 26, 1993. Id. at 950(g). The Fish and Wildlife representative's visit was canceled, though the reasons for the cancellation are unclear. See id. at 950(g) (July 1, 1993 letter stating that visit was canceled due to snow); Pl. Reply Exh. 1 at 1 (May 19, 1993 e-mail stating that visit was canceled due to "other priorities").

The Forest Service wrote to Fish and Wildlife on March 30, 1993, requesting a biological opinion for the Clearview sale. Def. Supp.App. at 944. Fish and Wildlife wrote to the Forest Service on April 9, 1993, recommending formal consultation for twelve

---

9. After an agency undergoes "consultation" with the Department of the Interior under the ESA, 16 U.S.C. § 1536(b), the Secretary of the Interior is required to produce a "biological opinion" regarding "whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(4) (2001).

10. The ESA requires that federal agencies "request of the Secretary [of the Interior] information whether any species which is listed or proposed to be listed may be present in the area" of proposed agency action, and "conduct a biological assessment" if the Secretary finds that "such species may be present." 16 U.S.C. § 1536(c)(1). The biological assessment process is undertaken "to facilitate compliance" with the consultation requirement. Id.

sales, although it is unclear whether the Clearview sale was included among those sales. *Id.* at 950(b) (minutes of April 21, 1993 meeting, referring to letter of April 9, 1993). An internal Forest Service memo on April 12, 1993 addressed unconfirmed murrelet sightings in the summer of 1992, *see* Def.App. at 424, and stated that a Fish and Wildlife representative "wanted to treat the unconfirmed sighting [on the site of another sale] as a confirmed sighting." *Id.* at 427. The same memo also stated that the author had been contacted by a Fish and Wildlife employee on March 19, 1993, regarding whether the Clearview site was suitable habitat for marbled murrelets, and that the author told the Fish and Wildlife representative that she "had no doubts ... [that] the habitat was suitable for marbled murrelets." *Id.* at 426. Forest Service and Fish and Wildlife representatives met on April 21, 1993, and discussed, *inter alia,* the need for formal consultation on specific sales. Def. Supp. App. at 950(b). It is unclear whether Clearview was discussed. *Id.* The participants in the meeting also acknowledged the sightings of marbled murrelets in the Happy Camp Ranger District in the summer of 1992 and discussed whether the sightings should be treated as confirmed or unconfirmed. *Id.* Forest Service and Fish and Wildlife representatives met again on June 9, 1993 and discussed where within the Clearview site a survey should be conducted. *Id.* at 950(c–f).

On July 1, 1993, Fish and Wildlife wrote to the Forest Service regarding two timber sales, including the Clearview sale, stating that the Forest Service at that time did not have "adequate information to insure that the proposed projects are not likely to jeopardize the marbled murrelet" and directing that the Forest Service conduct a survey with informal consultation from Fish and Wildlife. Def. Supp.App. at 950(g–h). A Forest Service internal e-mail on July 17, 1993 acknowledged the July 1, 1993 letter and requested that a Forest Service employee contact plaintiff regarding the survey. *Id.* at 950(j). Surveys were conducted by Forest Service employees between July 15, 1993 and August 13, 1993. Pl. Opp. Exh. 1 at 16(a). The surveys conducted in the summer of 1993 were not sufficient to satisfy the protocol. Pl. Opp. Exh. 1 at 16(a). On August 20, 1993, plaintiff requested permission to conduct further surveys. Def. Supp.App. at 952. Plaintiff and defendant agreed, on May 26, 1994, that plaintiff would conduct the survey and would be reimbursed for its costs. *Id.* at 951–53. The two-year survey was conducted by an independent contractor hired by plaintiff with defendant's approval, and was completed on August 24, 1995. *Id.* at 959. The survey detected no marbled murrelets. *Id.* at 965. On August 28, 1995, the Forest Service informed plaintiff that it was free to resume operations on the Clearview site, since no marbled murrelets had been detected. *Id.* at 962.

Plaintiff contends that defendant's failure to follow a management direction in 1992[11]

11. Fish and Wildlife issued a management direction in May 1992, noting that the marbled murrelet had been proposed for listing as a threatened species and ordering forest supervisors to conduct surveys in the summer of 1992 for sales within 35 miles of the coast. Pl. Supp. App. at 512. The Forest Service did not, however, conduct surveys on the Clearview site in 1992. Pl. Second PFUF ¶ 42. Plaintiff contends that the Forest Service's failure to conduct surveys on the Clearview site in 1992 was a breach of defendant's implied duty to cooperate. Pl. Opp. at 17.

Plaintiff brought suit under the Contract Disputes Act, 41 U.S.C. § 609(a)(1) (2001). Am. Compl. ¶ 1. The Contract Disputes Act states that "[a]ll claims by a contractor against the government relating to a contract shall be ... submitted to the contracting officer for a decision." 41 U.S.C. § 605(a) (2001). The court has no jurisdiction of Contract Disputes Act claims not presented to the contracting officer. *Santa Fe Eng'rs, Inc. v. United States,* 818 F.2d 856, 858 (Fed.Cir.1987). New claims, for purposes of this requirement, are claims not arising from the same set of operative facts as the claims submitted to the contracting officer. *Kinetic Builder's Inc. v. Peters,* 226 F.3d 1307, 1312 (Fed.Cir. 2000). Claims do not arise from the same set of operative facts when each claim "necessitate[s] a focus on a different or unrelated set of operative facts." *Id.* In this case, plaintiff did not raise the alleged failure to conduct surveys in the summer of 1992 in its claim submitted to the contracting officer. *See* Def.App. at 554–59. The evidence that this court would have to review to determine whether that alleged failure was a breach of defendant's implied duty to cooperate is unrelated to the evidence for plaintiff's other claims regarding defendant's suspension of the contract in September 1992 and defendant's failure to conduct surveys after the suspension. The court

and then to conduct adequate surveys in the summer of 1993 necessitated surveys in 1994 and 1995 and prevented plaintiff from resuming operations on the Clearview sale until after the completion of the 1995 survey. Pl. Opp. at 13–14. Plaintiff also contends that, because the duration of the delay was much longer than the 90–day period for consultation anticipated by the ESA, defendant's conduct was presumptively unreasonable. Pl. Reply at 15–17. The ESA provides that consultation shall be completed either within 90 days or "within such other period of time as is mutually agreeable to the Secretary and the Federal agency." 16 U.S.C. § 1536(b)(1)(A) (2000). It is not clear whether the length of the delay was "mutually agreeable" to the Secretary of the Interior and the Forest Service.[12]

The court cannot determine at this time whether defendant's failure to conduct surveys in conformance with the protocol on the Clearview site in 1993 was sufficiently unreasonable that it constituted a breach of contract. The reasons for the delaying until July 15, 1993 to begin the survey are not clearly explained in the record. The record refers to various discussions between Fish and Wildlife and the Forest Service regarding the initiation of consultations, but it does not explain why no surveys were conducted until July 15, 1993. Nor does the record indicate why the surveys that the Forest Service did conduct were insufficient to satisfy the survey protocol. Whether the delay violated the ESA's requirements regarding the length of the consultation period is also unclear.

The court notes that plaintiff has not argued that requiring two years of marbled murrelet surveys before permitting a timber sale to go forward was improper. See Pl. Opp. at 13 (arguing that, had defendant conducted surveys in the summer of 1992, "all surveying could have been completed by the end of the 1993 survey season"). There is a genuine issue of material fact, however, with respect to the Forest Service's failure to conduct surveys sufficient to satisfy the protocol on the Clearview site in 1993. If defendant had conducted surveys under the protocol in the summer of 1993, plaintiff would, presumably, have been able to resume its operations as early as the end of the summer of 1994, rather than at the end of the summer of 1995. If a failure to conduct adequate surveys was a violation of defendant's implied duty not to hinder or unreasonably delay performance and therefore a breach of contract, defendant may be liable for any damages caused by any period of unreasonable delay.

For the foregoing reasons, the court DENIES summary judgment to both plaintiff and defendant on Count II with respect to defendant's failure to conduct surveys sufficient to satisfy the protocol between September 28, 1992 and August 5, 1993.[13]

### D. Defendant's Actions Did Not Effect a Taking

■ Plaintiff argues in Count III of its Amended Complaint that defendant's suspension of operations on plaintiff's contract constituted a taking of private property without just compensation, in violation of the Fifth Amendment to the U.S. Constitution. Am.

---

therefore finds that plaintiff's claim regarding defendant's failure to conduct surveys on the Clearview site in the summer of 1992 is not within the court's jurisdiction. See Croman, 44 Fed.Cl. at 802 ("Because the contracting officer was only presented with governmental acts surrounding the listing of the marbled murrelet as threatened under the ESA on or around September 28, 1992 as the basis for Croman's claim, this court has jurisdiction to consider only that claim."); see also supra n. 1 and accompanying text.

12. The ESA does provide that the consultation period will only be extended past 150 days for a "permit or license applicant" upon the appli-

cant's consent. 16 U.S.C. § 1536(b)(1)(B) (2001). Plaintiff has not alleged that plaintiff is a permit or license applicant, and the court does not address that possibility. The court notes, moreover, that the protocol for marbled murrelet surveying requires two years of surveys before a site may be considered free of marbled murrelet habitat, which clearly goes well beyond the ESA's default consultation period of 90 days. Pl.App. at 234. The period of the consultation does not by itself establish that defendant's conduct was unreasonable.

13. The protocol defined the end of the survey season as August 5 of each year. Pl.App. at 231.

Compl. ¶ 77. When the government acts as a contractor, its breaches of contract are governed by contract law. *Winstar*, 518 U.S. at 895, 116 S.Ct. 2432 (plurality opinion of Souter, J.). When the government deprives a private party of property rights created by a contract, the deprivation is usually classified as a breach of contract, not as a taking. *See, e.g., Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 572 F.2d 786, 818 (1978) (stating that "the concept of a taking as a compensable claim theory has limited application" to contractual rights and that "interference with such contractual rights generally gives rise to a breach claim not a taking claim"); *Sunrise Village Mobile Home Park, L.C. v. United States*, 42 Fed.Cl. 392, 404 (1998) ("[I]f the government's actions allegedly breached a contract, the appropriate remedy is a breach of contract claim, not a claim for compensation pursuant to the Takings Clause.").

A takings claim may be appropriate when the scope of the alleged taking differed from the scope of the property right created by the contract. *See Integrated Logistics Support Sys. Int'l, Inc. v. United States*, 42 Fed.Cl. 30, 34 (1998), *appeal docketed*, No. 01–5003 (Fed.Cir. Oct. 17, 2000). The property alleged to have been taken here is "the rights granted to plaintiff under the Clearview contract." Am. Compl. ¶ 76. Plaintiff's takings claim is specifically pled in the alternative, applicable in the event that the court finds that the government "act[ed] solely in its sovereign capacity." Pl. Opp. at 20. The court has already found that the sovereign acts doctrine does not apply to the issues involved in this case because the contract itself addressed the subject of the dispute. *See supra* subsection I.B. The court notes in addition that plaintiff had no property right in the timber itself, since, under section B8.11 of the contract, defendant retained title to the timber until it was "cut, scaled, and paid for." Def.App. at 59. Plaintiff's only property interest lay in its right to performance under the contract. *See Buse Timber & Sales, Inc. v. United States*, 45 Fed.Cl. 258, 263 (1999) (finding that, in light of a similar clause, "the property interest allegedly taken was the right to performance under the contract rather than title to the unharvested timber"). Accordingly, plaintiff's sole remedy in these circumstances is for breach of contract. Defendant's Motion for Summary Judgment is GRANTED with respect to Count III of the Amended Complaint.

### E. Plaintiff Did Not Waive Any Breach

Defendant argues that plaintiff waived any breach of contract claim for the suspension of its operations in 1992 by failing to assert its rights in a timely fashion. Def. Reply at 13–14. Waiver of a contract breach may be found when the nonbreaching party fails to terminate the contract "within a reasonable time after the default under circumstances indicating forbearance" and the breaching party "reli[es] ... on the failure to terminate and continue[s][to] perform[ ] ... with the [nonbreaching party's] knowledge and implied or express consent." *DeVito v. United States*, 188 Ct.Cl. 979, 413 F.2d 1147, 1154 (1969). Defendant has not argued, and the court does not find, that the Forest Service relied on plaintiff's failure to terminate the contract after the suspension, or that the Forest Service continued to perform with plaintiff's consent. Defendant's reliance on *J.A. Ross & Co. v. United States*, 126 Ct.Cl. 323, 115 F.Supp. 187 (1953), is inapposite, since *Ross* involved a breach of which defendant was unlikely to be aware and which plaintiff did not bring to defendant's attention. *Ross*, 115 F.Supp. at 190 (noting that "[c]ontracting officers are rarely on the ground where the work is going on" and that "[p]laintiff never protested" the alleged breach). Because defendant has failed to show any evidence on at least two elements of waiver, plaintiff is entitled to summary judgment that it has not waived defendant's alleged breach.

### III. Conclusion

For the foregoing reasons, defendant's Motion for Summary Judgment on Count II of the Amended Complaint is GRANTED with respect to the assertion that the initial suspension of the contract following the listing of the marbled murrelet as a threatened species was not a breach of contract. Defendant's Motion for Summary Judgment on Count II is otherwise DENIED. Defen-

dant's Motion for Summary Judgment is GRANTED with respect to Count III of the Amended Complaint. Plaintiff's Motion for Summary Judgment on Count II is GRANTED with respect to the following assertions: (a) that defendant suspended the contract after the listing of the marbled murrelet as a threatened species on September 28, 1992, (b) that the contract and not the sovereign acts doctrine governs the parties' rights in connection with the suspension; and (c) that plaintiff has not waived defendant's breach. Plaintiff's Motion for Summary Judgment on Count II is otherwise DENIED. Plaintiff's Motion for Summary Judgment on Count III is DENIED.

On or before July 31, 2001, the parties shall file a joint statement proposing further proceedings in this matter. If the parties cannot agree on further proceedings, they shall file separate statements. The parties shall address whether this case should be consolidated with the case docketed as 01–40 C for further proceedings.

IT IS SO ORDERED.